**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**HEIDI G.,**

                                        **Plaintiff,**

        **v.**                                                **5:20-CV-145**
                                                                 **(TJM)**

**COMMISSIONER OF SOCIAL SECURITY,**

                                        **Defendant.**
_____

**THOMAS J. McAVOY,**
**Sr. U. S. District Judge**

### DECISION & ORDER

Plaintiff Heidi G. brings this action pursuant to the Social Security Act, 42 U.S.C. §

405(g), for review of a final determination by the Commissioner of Social Security denying

her application for benefits.  Plaintiff alleges that the Administrative Law Judge's ("ALJ")

decision denying her application was not supported by substantial evidence and contrary to

the applicable legal standards.  Pursuant to Northern District of New York General Order

No. 8, the Court proceeds as if both parties had accompanied their briefs with a motion for

judgment on the pleadings.

### I.    PROCEDURAL HISTORY

Plaintiff applied for Supplemental Security Income Benefits ("Title XVI") from the

Social Security Administration on November 17, 2016.  See Social Security Administrative

Record ("R"), dkt. # 9, at 157-177.  The Social Security Administration denied Plaintiff's

application on February 15, 2017.  Id. at 69-79.  Plaintiff appealed, and Administrative Law

Judge Jude B. Mulvey held a hearing on October 23, 2018, where a Vocational Expert

1

testified.  Id. at 29-67.  The ALJ issued an unfavorable decision on December 3, 2018,

finding that Plaintiff had not demonstrated she was eligible for benefits under Title XVI.  Id.

at 7-24.  Plaintiff appealed, and the Social Security Appeals Council denied her request for

review on December 10, 2019.  Id. at 1-6. Plaintiff then filed the instant action in this Court.

This Court has jurisdiction over the ALJ's decision pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3).

## II.     FACTS

The Court will assume familiarity with the facts and set forth only those facts

relevant to the Court's decision in the body of the decision below.

## III.    THE ADMINISTRATIVE LAW JUDGE'S DECISION

The question before ALJ Mulvey was whether Plaintiff was disabled under the Social

Security Act.  The ALJ engaged in the five-step analysis required by 20 C.F.R. §

416.920(a) to determine whether a claimant qualifies for disability benefits.  See R. at 7-24.

> The Social Security Administration regulations outline the five-step,
> sequential evaluation process used to determine whether a claimant is
> disabled: (1) whether the claimant is currently engaged in substantial gainful
> activity; (2) whether the claimant has a severe impairment or combination of
> impairments; (3) whether the impairment meets or equals the severity of the
> specified impairments in the Listing of Impairments; (4) based on a "residual
> functional capacity" assessment, whether the claimant can perform any of his
> or her past relevant work despite the impairment; and (5) whether there are
> significant numbers of jobs in the national economy that the claimant can
> perform given the claimant's residual functional capacity, age, education, and
> work experience.

McIntyre v. Colvin, 758 F.3d 146, 150 (2d Cir. 2014).

At Step 1, the ALJ concluded that Plaintiff had not engaged in any activity since the

application date, November 17, 2016.  Id. at 12.  At Step 2, the ALJ found that Plaintiff

2

suffered from the severe impairments of depression, anxiety, hypothyroidism, and foot

impairment.  Id.  Such impairments significantly limited Plaintiff's ability to perform basic

work activities.  Id.  Other ailments in the record, like headaches and hypertension, had

been effectively managed and did not cause limitations to Plaintiff's ability to engage in

work.  Id.  At Step 3, the ALJ concluded that Plaintiff did not have an impairment or

combination of impairments that meets or medically equals the severity of the listed

impairments in 20 CFR §§ 416.920(d), 416.925 and 416.926.  Id. at 13.  In assessing

Plaintiff's mental functioning, the ALJ concluded that she did not have either one extreme

limitation or two marked limitations in broad areas of functioning.  Id. at 14.  The ALJ did

not discuss any physical limitations from which Plaintiff may have suffered.

At Step 4, the ALJ found that Plaintiff has the residual functional capacity to perform

light work, except that she is limited to simple routine repetitive tasks in a work environment

without fast-paced production requirements.  Id. at 15.  She can make only "simple work-

related decisions with few if any workplace changes."  Id.  Plaintiff may "work in proximity of

others," but she should not work "in conjunction with others and should predominantly"

focus on "objects rather than people."  Id.  "In addition she can perform work that does not

require more than short simple interactions with co-workers and supervisors and

occasional interaction with the public."  Id.  After discussing the psychiatric and medical

evidence, the ALJ found that Plaintiff's "medically determinable impairments could

reasonably be expected to cause the alleged symptoms; however, the claimant's

statements concerning the intensity, persistence and limiting effects of these symptoms are

not entirely consistent with the medical evidence and other evidence in the record[.]"  Id. at

17.  The ALJ also found that Plaintiff could not perform any of her past relevant work.  Id.

At Step 5, the ALJ found that significant jobs existed in the national economy which the Plaintiff could perform, considering her "age, education, work experience, and residual functional capacity." Id. at 18.  Noting that Plaintiff could not perform the entire range of light work, the ALJ turned to a vocational expert to determine "whether jobs exist in the national economy" for a person of Plaintiff's capabilities.  Id. at 18.  That expert testified that Plaintiff could work as a collater operator, marker, and router, and that those jobs were significantly available in the national economy.  Id.  Given that finding, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  Id.  Plaintiff challenges this finding.

## IV.    STANDARD OF REVIEW

The Court's review of the Commissioner's determination is limited to two inquiries. See 42 U.S.C. § 405(g).  First, the Court determines whether the Commissioner applied the correct legal standard. See Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990); Shane v. Chater, No. 96-CV-66, 1997 WL 426203, at *4 (N.D.N.Y July 16, 1997)(Pooler, J.)(citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)).  Second, the Court must determine whether the Commissioner's findings are supported by substantial evidence in the administrative record.  See Tejada, 167 F.3d at 773; Balsamo, 142 F.3d at 79; Cruz, 912 F.2d at 11; Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).  A Commissioner's finding will be deemed conclusive if supported by substantial evidence. See 42 U.S.C. § 405(g); see also Perez, 77 F.3d at 46; Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)("It is not the function of a reviewing court to determine de novo whether a Plaintiff is disabled.  The [Commissioner's] findings of fact, if supported by substantial

evidence, are binding.")(citations omitted).

In the context of Social Security cases, substantial evidence consists of "more than a mere scintilla" and is measured by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 842 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)).  Where the record supports disparate findings and provides adequate support for both the Plaintiff's and the Commissioner's positions, a reviewing court must accept the ALJ's factual determinations. See Quinones v. Chater, 117 F.3d 29, 36 (2d Cir. 1997)(citing Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)); Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990).  Although the reviewing court must give deference to the Commissioner's decision, a reviewing court must bear in mind that the Act is ultimately "'a remedial statute which must be 'liberally applied;' its intent is inclusion rather than exclusion.'" Vargas v. Sullivan, 898 F.2d 293, 296 (2d Cir. 1990)(quoting Rivera v. Schweiker, 717 F.2d 719, 723 (2d Cir. 1983)).

## V.    ANALYSIS

Plaintiff points to two separate errors by the ALJ, one related to the ALJ's findings about her mental capacity and one related to the ALJ's conclusions about her physical abilities.  The Court will consider each in turn.

### A.    Mental Capacity

Plaintiff alleges that the ALJ erred in evaluating the opinion evidence on Plaintiff's mental condition and instead substituted her own lay interpretation.  In doing so, Plaintiff claims, the ALJ "blatantly mischaracterized the record to support her analysis."  By misstating the record, Plaintiff claims, the ALJ lacked substantial evidence for her opinion.

In describing Plaintiff's mental state, the ALJ wrote:

> From the psychiatric standpoint, in September 2017, an evaluation was made at the St. Elizabeth Medical Center when the claimant was seen at the emergency room after experiencing some suicidal ideation, though on exam she stated "she would never do that." (Exhibit B13F, page 5). The diagnosis formed was for major depression, recurrent, and she was simply discharged home advised to continue on her routine medications. (See also Exhibit B8F, page 4). This is all in keeping with [a] somewhat earlier established diagnosis for depressive disorder NOS, severe but without psychotic features, from Cayuga Community Mental Health Center. (Exhibit B10F). Treating notes from Cayuga also indicate sporadic use of marijuana for help getting to sleep. (Exhibit B1F, page 4). The Cayuga notes also suggest some improvement over time, since the October 2016 reports tend to indicate the additional presence of possible borderline personality disorder, and chronic difficulties controlling her anger, and trouble handling any significant levels of stress, along with intermittent paranoid ideation, all features of which are later absent from their reports.

R. at 16.

Police brought Plaintiff to the emergency room at the Auburn, New York, Community Hospital on September 25, 2017. Id. at 617. Dr. Eric Hojnowski examined Plaintiff and concluded that she represented a substantial risk of physical harm to herself because of threats to undertake suicide or do other harm to herself. Id. at 620. Plaintiff had reportedly called the New York State Police and informed them that he had a "desire to drive off [hte] road and/or take [an] overdose of pills to kill herself." Id. at 621. Hojnowski recommended Plaintiff be admitted, noting that she had expressed on evaluation "that she will find a way to kill herself even if it means starving herself." Id. Records show Plaintiff's admission after examination "as an involuntary-status patient to this hospital for persons with mental illness for immediate observation, care and treatment." Id. at 622.

Plaintiff arrived at St. Elizabeth Medical Center in Utica, New York on September 25, 2017. Id. at 732. She related that she had suicidal thoughts which had gradually appeared. Id. The feelings were "moderate" and caused by "situational problems." Id.

6

While most of Plaintiff's vital signs appeared normal, she demonstrated a depressed mood and affect, and appeared to be fearful.  Id. at 737.  Doctors admitted her as a psychiatric inpatient.  Id. at 741.  On admission health professionals concluded that Plaintiff had improved to a stable condition.  Id. at 743.

A psychiatric evaluation conducted on September 26, 2017 at St. Elizabeth described Plaintiff as a single person who had a "lot of stress in her life, depressed, made suicidal statements."  Id.  at 727.  She told the evaluator that she had been mistaken to call 911 to report her desire to kill herself.  Id.  Plaintiff reported numerous "stressors" in her life: living with her mother and a stepfather suffering from Alzheimer's disease; stress about caring for them; and grief about the death of her 19-year-old son two years previously.  Id.  These "stressors" made Plaintiff "depressed and suicidal."  Id.  "Usually when she has the thoughts she said she calls the Crisis [hotline] and she thought 911 would be better and she called 911."  Id.  While Plaintiff admitted to making a statement about her desire to die, she stated that she "never made a suicidal attempt and" had "never [been] in a psychiatric hospital like this and she would never do that."  Id.  Plaintiff claimed that she felt "depressed[,] down in the dumps, helpless and hopeless at times."  She had "[n]o plans to harm herself" and was "[n]ot suicidal, not homicidal, not psychotic," and was "in touch with reality."  Id.

Suresh Rayancha, MD, who evaluated Plaintiff, reported that doctors did not have a list of Plaintiff's "psychiatric medications."  Id. at 729.  He reported that Plaintiff appeared "[a]lert, cooperative, and well oriented x3."  Id.  She offered "clear, coherent" speech, and showed "[n]o flight of ideas or looseness of association."  Id.  Plaintiff admitted "being depressed" but denied "any suicidal or homicidal thoughts or plans."  Id.  She had a varied

appetite and sleep schedule.  Id.  Dr. Rayancha found her "[c]oncentration fair."  Id.

Plaintiff denied having hallucinations and Rayancha had not "elicited" any "specific

delusions."  Id.  Plaintiff had an "intact" memory, and Rayancha did not see any "evidence

of psychosis or organicity."  Id.  "Insight and judgment were impaired" but Plaintiff was

"better now."  Id.  He offered a provisional diagnosis of "[m]ajor depression, recurrent."  Id.

Dr. Rayancha concluded that Plaintiff had "made a suicidal statement" to police, who took

her to the hospital.  Id.  Because no beds were available at the hospital, Plaintiff ended up

at St. Elizabeth.  Id.  Doctors there "watched her closely," and Plaintiff denied she had "any

suicidal or homicidal thoughts or plans" and did not "make any gestures."  Id.  Dr.

Rayancha spoke with Plaintiff's mother and found the mother "a great support for her."  Id.

Plaintiff's mother explained that "when [Plaintiff] feels like death, she usually calls the crisis

and they feel comfortable taking the patient back."  Id.  Rayancha allowed Plaintiff to return

home with her mother after he confirmed that Plaintiff had a Social Service appointment.

Id.

     Plaintiff saw Cheri Wakeham, LMSW, on June 12, 2018.  Id. at 747-749.  Wakeman

updated Plaintiff's status by reporting that "[s]he has continued to struggle with symptoms

of anxiety as well as" a continuing "pattern of unstable and intense interpersonal

relationships that alternate between extremes of idealization and devaluation, difficulty

controlling anger (frequent displays of temper and constant anger) and transient stress

related to paranoid ideation."  Id. at 747.  Still, Plaintiff decided to stop taking medication

and rely only on therapy.  Id. at 747-48.  Wakeham diagnosed Plaintiff with major

depressive disorder, recurrent, severe with psychotic features, borderline personality

disorder, and other specified anxiety disorders.  Id. at 748.

This evidence supports Plaintiff's argument that the ALJ lacked substantial evidence for her conclusion that "[t]he Cayuga notes also suggest some improvement over time, since the October 2016 reports tend to indicate the additional presence of possible borderline personality disorder, and chronic difficulties controlling her anger, and trouble handling any significant levels of stress, along with intermittent paranoid ideation, all features of which are later absent from their reports."  First, the undisputed fact that Plaintiff expressed suicidal ideation in September 2017 suggests that Plaintiff's psychiatric condition had not improved since 2016, but had instead become more difficult.  Second, other treatment notes after the hospitalization indicate that Plaintiff continued to suffer from major depression and anxiety after she expressed a desire to end her life in September 2017.  Finally, the Second Circuit Court of Appeals has emphasized that short periods of improvement for people who suffer from mental illness are not strong proof supporting a finding that a person is not disabled: "'[c]ycles of improvement and debilitating symptoms [of mental illness] are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working.'"  Estrella v. Berryhill, 925 F.3d 90, 97 (2d Cir. 2019).  The Court therefore finds that the ALJ misread the evidence and substituted her own judgment for the findings contained in the medical record.  Remand on this basis alone would be appropriate.

Plaintiff also complains that the ALJ improperly substituted her own opinion for that of the medical experts.

The ALJ concluded that:

As for the opinion evidence, only partial weight can be given to each evaluation

9

provider.  State Agency analyst K. Lieber-Diaz, Psy.D. (Exhibit B2A) did not personally examine the claimant though the assessed limitations are fairly consistent with the entirety of the medical evidence at this time, suggesting only mild-to-moderate mental function restrictions.  Dr. Noia's assessment (Exhibit B2F) is similar, adding moderate problems handling stress, but again it is based on less than treating familiarity with the claimant and is perhaps too conservative in the assignment of specific limitations. Likewise, the consultative examination report from Dr. Ganesh is employed here only partially, for basically the same reasons (Exhibit B3F).[1]

On the other had, the report from treating psychiatric nurse practitioner Shelyagh Kennedy (Exhibit B4F) is granted only very partial weight primarily because there appears to be overstatement, even exaggeration there of the actual mental restrictions in this case.  In particular, the notation for "marked problems with sustaining attention/concentration, maintaining a schedule, completing a workday/workweek without interruption from psychiatric symptoms, and maintaining a consistent pace," is not supported elsewhere throughout the entirety of the medical evidence available at this time.

R. at 17.

The Court finds the ALJ's explanation of the weight assigned to the various expert opinions and her justification for the very "very partial weight" assigned to the treating physician insufficient.  The ALJ's explanation for the weight assigned and the uses made of the examining experts' opinions is vague and unclear.  The Court cannot determine which parts of those opinions the ALJ found supported by sufficient evidence and which parts are not.  The ALJ finds, for example, that Dr. Noia's opinion is "perhaps too conservative in the assignment of specific limitations," but does not state clearly where the opinion errs in this way, and how.   Such vague explanations of the weight assigned to various opinions mean that the Court cannot know how the ALJ used those opinions in coming to the RFC she assigned.  Courts are clear that "[n]either a reviewing judge nor the Commissioner" of

---

[1]Dr. Ganesh consulted on physical limitations.  The statement is included to demonstrate how the ALJ approached the reports.

Social Security "is 'permitted to substitute [her] own expertise or view of the medical proof for the treating physician's opinions' or indeed any 'competent medical opinion.'" Burgess v. Astrue, 537 F.3d 117, 131 (2d Cir. 2008) (quoting Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Balsamo v. Chater, 142 F.3d 75, 81 (2d cir. 1998)).   By failing to explain in any detail how she evaluated the expert opinions, the ALJ has substituted her opinion for that of competent medical professionals.  The Court will remand and direct the ALJ to better explain how the expert opinions factor into Plaintiff's RFC.[2]

### B.    Physical Capacity

Plaintiff argues that the Court must remand the case to the Commissioner for further development of the record because the ALJ failed to obtain additional medical information to determine whether bunion surgery that Plaintiff underwent after her consultative examination altered her capacity to work.

With reference to Plaintiff's physical limitations, the ALJ concluded:

As to claimant's very real history of problems with her feet,[3] in December 2016, Finger Lakes Podiatry noted right foot pain with a lesion on the bottom of the foot, though the claimant was not taking anything for the pain; she had in the past undergone some bunion surgery through another office, several years earlier

---

[2]Plaintiff asserts that the record is clear that she is disabled and that there is no need for remand to develop the record further.  The Court, she claims need only direct the Commissioner to calculate the amount of benefits owed.  She points out that the Second Circuit Court of Appeals has found that "where this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for calculation of benefits."  Rosa v. Callahan, 168 F.3d 72, 83 (2d Cir. 1999).  The Court finds that the record needs further development to determine whether Plaintiff is disabled either mentally or physically or in combination, and will remand for further development of the record.

[3]The Court notes that substantial evidence in the record supports a finding that Plaintiff suffers from a mental illness, and that a mental illness, like a physical illness, can constitute a real illness that causes a disability.

11

(Exhibit B7F, page 2). It appeared that this surgery had not corrected the problem, so revision buionectomy with removal of previous screw was performed in early 2017. (Exhibit B7F, page 13) Results were not entirely satisfactory, and in October 2017 Auburn Orthopaedic Specialists determined recurrence of hallus valgus and Tailor's bunion deformity with intractable plantar keratosis on the right foot. (Exhibit B15F, page 3) Thus, in November 2017, special Austin/Akin bunionectomy was conducted along with Talior's bunionectomy with osteotomy and removal of prior hardware, for working diagnoses of hallux abducto valgue, Tailor's bunion, and painful-retained hardware, all on the right foot. (Exhibit B12F, page 46; see also Exhibit B11F, pages 40 *et seq.*)

Post-surgical follow-up a few weeks later indicated good maintenance and correction of the deformity, and incisions doing well. (Exhibit B15F, page 7) By December 4, 2017, she was ambulating in post-operative surgical shows with predicated transition in about two more weeks over to regular shoes. She was overall doing very well. (Exhibit B15F, page 11)

However, in April 2018 it became clear that problems were developing with the left foot, with mild hallux valgus and Tailor's bunion deformity there also. The claimant understandably wanted to wait for surgery until the fall season of 2018, given all she had been through. (Exhibit B15F, page 15) In August 2018, the Auburn group also reported painful hyperkertotic lesion on the left foot. At that time there was no indication that the claimant would because of this be precluded from routine walking but only that there was reasonable advisement that she wear "more accommodative shoes such as a memory foam inside." Follow-up was scheduled for two months later for repeat evaluation. (Exhibit B15F, page 17)

R. at 16-17.

Kalyani Ganesh, M.D., prepared a consultative medical report on February 3, 2017. In that report, Ganesh report that, on examination, Plaintiff had a "normal" gait and did not appear to be in "acute distress." R. at 318. She could walk on her heels, but not her toes. Id. Plaitniff did not use an assistive device, could change clothing for the exam without aid, and could rise from her chair without difficulty. Id. Ganesh diagnosed Plaintiff with "[h]istory of open reduction, internal fixation right ankle," and a "[h]istory of bunion surgery." Id. at 319. He found her prognosis "stable" and assigned "[n]o gross limitations." Id. at 319.

As explained above, the ALJ did not conclude that Plaintiff faced any limitations due to her foot issues.  The ALJ did not conclude that the surgeries that Plaintiff underwent had caused any issues.  Still, she assigned only "partial" weight to Dr. Ganesh's opinion, without offering any detailed explanation.  As above, the Court must conclude that the ALJ substituted her own judgment for that of the experts in this case.  On that basis alone, the case should be remanded.  In addition, as the ALJ acknowledged, the record indicates that Plaintiff underwent surgery after Ganesh rendered his report.  The last records available to the ALJ indicated that Plaintiff was still recovering.  Because she did not seek additional information, the ALJ had to speculate on the Plaintiff's present circumstances and prognosis.  The ALJ thus lacked substantial evidence for her conclusions about Plaintiff's physical limitations.  Under those circumstances, the Court must remand for further development of the record.

. **VI.    CONCLUSION**

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is **GRANTED in part** and **DENIED** in part.  The motion is denied with respect to Plaintiff's request that the case be remanded to the Commissioner for the sole purpose of calculating benefits and granted with respect to Plaintiff's appeal of the Commissioner's decision denying her benefits. The Clerk of Court is directed to **REMAND** the matter to the Commissioner of Social Security for proceedings consistent with this opinion.  The Commissioner's motion for judgment on the pleadings is **DENIED.**

Thomas J. McAvoy
Senior, U.S. District Judge

13

**IT IS SO ORDERED.**

**Dated**: **February 24, 2021**